## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

TRISTAR PRODUCTS, INC.
(a Florida Corporation),

                      Plaintiff,

v.

TELEBRANDS CORPORATION,
WHELE LLC d/b/a PERCH, and
JEFFREY L. SNOW,

                      Defendants.

No. _____

## COMPLAINT
## JURY TRIAL DEMANDED

## COMPLAINT FOR TORTIOUS INTERFERENCE, FRAUD, CONSPIRACY, AND ATTEMPTED MONOPOLIZATION

## INTRODUCTION

A sure-fire way to tell you are doing something wrong is to consider whether you are comfortable doing it openly, in public. Actions taken under the cloak of darkness, by contrast, are rarely appropriate.

Tristar Products, Inc. ("Tristar") brings this action for tortious interference with contractual relations, fraud, conspiracy and attempted monopolization against Telebrands Corporation, Whele LLC d/b/a Perch, and Jeffrey L. Snow, Esq., to seek remedy for an unlawful and brazen scheme (i) to interfere with and procure the wrongful termination of an exclusive license arrangement between Tristar and non-

party Ragner Technology Corporation ("RTC"); (ii) to procure a purported assignment of RTC's patent portfolio to Telebrands in knowing contravention of Tristar's accrued license rights, ongoing license rights and right of first refusal; (iii) to wrongfully assert ownership over, and then wrongfully procure the cancellation of, patent rights that have been (and remain) the subject of multiple litigations for over a decade—litigations in which RTC, as patent owner, and Tristar, as exclusive licensee, have been asserting those very patents against Telebrands (and, more recently, Perch); and (iv) to attempt to establish a wrongful monopoly by pursuing patent litigation against Tristar based on the fraudulent, ineffective and incomplete procurement of RTC's patent rights.

For two years or more, Defendants carried out their plans in secret, notwithstanding ongoing litigation and lengthy mediation proceedings. In fact, as of the date of this Complaint, Telebrands has still refused to disclose (or consent to the disclosure by RTC of) the terms of its purported arrangements with RTC. The clandestine nature of Defendants' activities confirms they have done something they should not.

As Justice Brandeis famously stated, "sunlight is said to be the best of disinfectants." Here, Defendants engaged in a concerted effort to hose Tristar, RTC, the Patent Office, and the consumer marketplace. All in darkness. Tristar now endeavors to bring those bad acts into the sunlight.

## PARTIES

1.      Plaintiff Tristar Products, Inc. ("Tristar") is a Florida corporation with a principal place of business at 2050 W. County Highway, Santa Rosa Beach, FL 32459.

2.      Defendant Telebrands Corporation ("Telebrands") is a New Jersey corporation and, upon information and belief, has a principal place of business at One Telebrands Plaza, Fairfield, NJ 07004.

3.      Defendant Whele LLC d/b/a Perch ("Perch") is a Delaware limited liability company and, upon information and belief, has a principal place of business at 200 Berkeley Street, Boston, MA 02116.

4.      Defendant Jeffrey L. Snow ("Snow") is, upon information and belief, an individual domiciled in New York, NY.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

6.      This Court additionally has jurisdiction over the subject matter of the claim for violating 18 U.S.C. § 1962(c) (colloquially, a "Civil RICO" violation) under 18 U.S.C. § 1964 and 28 U.S.C. § 1331.  This Court has supplemental

jurisdiction over the remaining claims under 28 U.S.C. § 1367(a), because they arise from the same nucleus of operative fact.

7.    This Court additionally has jurisdiction over the subject matter of the claim for attempted monopolization under 15 U.S.C. § 15, 15 U.S.C. § 26, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), because they arise from the same nucleus of operative fact.

8.    Defendant Telebrands is subject to the Court's general and specific personal jurisdiction because, on information and belief, it has sufficient minimum contacts within Florida and this District, pursuant to due process and the Florida Long Arm Statute, Fla. Stat. § 48.193, including because it participated in the commission of the tortious and unlawful acts alleged herein within this state.  And on information and belief, Defendant Telebrands purposefully availed itself of the privileges of conducting business in Florida and in this District; Defendant Telebrands regularly conducts and solicits business within Florida and within this District; and Defendant Telebrands distributes, makes available, imports, sells and offers to sell products and services throughout the United States, including in this judicial District.

9.    Defendant Perch is subject to the Court's general and specific personal jurisdiction because, on information and belief, it has sufficient minimum contacts within Florida and this District, pursuant to due process and the Florida Long Arm

Statute, Fla. Stat. § 48.193, including because it participated in the commission of the tortious and unlawful acts alleged herein within this state. And on information and belief, Defendant Perch purposefully availed itself of the privileges of conducting business in Florida and in this District; Defendant Perch regularly conducts and solicits business within Florida and within this District; and Defendant Perch distributes, makes available, imports, sells and offers to sell products and services throughout the United States, including in this judicial District.

10. Defendant Jeffrey L. Snow is subject to this Court's general and personal specific jurisdiction at least because, on information and belief, he has sufficient minimum contacts within Florida and this District, pursuant to due process and the Florida Long Arm Statute, Fla. Stat. § 48.193, including by submitting himself to the jurisdiction of the courts of the State of Florida by participating in the commission of the tortious and unlawful acts alleged herein within this state.

11. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because Defendants regularly conduct business within this judicial district, and because Defendants' conduct has harmed Tristar, which resides in this judicial district. Thus, a substantial part of the events giving rise to Tristar's claims occurred in this judicial district.

## RELEVANT FACTS

**A.    The Ragner Patents and Tristar's Exclusive Licenses Thereto**

12.    Gary Dean Ragner ("Ragner") is an engineer and co-inventor of various expandable and retractable hose technologies, for which Ragner holds dozens of United States patents, including U.S. Patent Nos. 7,549,448 ("'448 Patent"); 9,022,076 ("'776 Patent"); 9,371,944 ("'944 Patent"); and 9,182,057 ('057 Patent) (together, the "Ragner Asserted Patents").  Ragner developed a prototype called the "MicroHose" that embodies his patented hose technology.

13.    Ragner formed Ragner Technology Corporation ("RTC") to develop and commercialize Ragner's inventions, including but not limited to the expandable and retractable hose products.



14.    Beginning in 2012, RTC entered into an exclusive licensing arrangement with Tristar, granting Tristar a license under a number of Ragner's patents (collectively, the "Ragner Patents") so that Tristar could commercialize Ragner's expandable and retractable hose technology through Tristar's sales of hoses under the brand name "Flex-Able Hose."

**1. The 2012 Exclusive Tristar License**

15.    Specifically, on October 19, 2012, RTC and Tristar entered into an exclusive license agreement ("2012 Exclusive Tristar License").

16.    The 2012 Exclusive Tristar License granted Tristar "the exclusive, transferable . . . worldwide license [], with a right to grant sublicenses, to the Licensed Patents to use, manufacture, have manufactured, offer for sale, sell, distribute, import, export, or otherwise dispose of any Licensed Product as the global exclusive distributor of the Licensed Products for the period of [the] Agreement."

17.    The 2012 Exclusive Tristar License defined "Licensed Products" to mean "any device intended for consumer use falling within the scope of any claim of the Licensed Patents . . . ."

18.    The 2012 Exclusive Tristar License defined "Licensed Patents" to mean "(1) U.S. Patent Nos. 6,498,527 and 7,549,448; (2) U.S. pending patent application 11/343,602; (3) all patents or patent application which are, in the future, filed by or on behalf of RTC, or which are acquired by RTC . . . , which contain one or more claims which could reasonably be construed as covering a Licensed Product, and (4) all patents which may be granted on any of the items listed in subparagraphs (1)-(3), and all reissues and extensions thereof."

19.    The 2012 Exclusive Tristar License granted Tristar the right to bring and control lawsuits with respect to any infringement of the Licensed Patents.

20.    The 2012 Exclusive Tristar License granted Tristar a "right of first offer" before Ragner was permitted to assign the parties' agreement "to any entity in the business of consumer product manufacturing or distribution."

21.    The 2012 Exclusive Tristar License provided that Tristar "may grant sublicenses under the License Grant provided . . . any sublicensee shall have no greater right to use, manufacture, have manufactured, offer for sale, sell, distribute, import, export or otherwise dispose of any Licensed Product than granted to Licensee in this Paragraph."

22.    The 2012 Exclusive Tristar License provided that "[u]nless terminated earlier in accordance with this Paragraph 9, this Agreement shall expire, upon the expiration of the last to expire Licensed Patents."

23.    Accordingly, the 2012 Exclusive Tristar License was not set to expire prior to at least 2033.

24.    The 2012 Tristar Exclusive License provided that RTC could terminate the agreement under limited circumstances, namely "in the event [Tristar] fails to pay any amounts due and payable to Licensor hereunder, and fails to make such payment within thirty (30) calendar days after receiving written notice of such failure," and in the event Tristar "commits a material  breach of [the] Agreement, and fails to cure that breach within thirty (30) calendar days after receiving written notice thereof . . . ."

### 2. The 2015 Exclusive Tristar License

25.    On November 9, 2015, RTC and Tristar entered into another exclusive license agreement with Tristar ("2015 Exclusive Tristar License," together with the 2012 Exclusive Tristar License, the "Tristar Exclusive Licenses").

26.    The 2015 Exclusive Tristar License granted Tristar "the exclusive, transferable . . . worldwide license [] to the Bungee Hose Patents to use, manufacture, have manufactured, offer for sale, sell, distribute, import, export or otherwise dispose of Licensed Bungee Hose Products . . . ."

27.    The 2015 Exclusive Tristar License defined "Licensed Bungee Hose Products" as "a Bungee Hose which is designed for consumer use."

28.    The 2015 Exclusive Tristar License defined "Bungee Hose Patents" to mean "the Bungee Hose Application [U.S. Patent Appl. No. 14/455,461, which issued as U.S. Patent No. 9,182,057], the Bungee Hose Continuation [U.S. Patent Appl. No. 14/831,313], and the Bungee Hose PCT Application [PCT/US2014/050562], together with: (a) all applications claiming priority [therefrom], including continuations, divisions, continuations in part, and corresponding foreign applications; and (b) all patents which may be granted on [the listed applications] or any of the items listed in subparagraph (a)."

29.    The 2015 Exclusive Tristar License granted Tristar the right to bring and control lawsuits with respect to any infringement of the Bungee Hose Patents.

30.    The 2015 Exclusive Tristar License granted Tristar a "right of first offer" before Ragner was permitted to assign the parties' agreement "to any entity in the business of consumer product manufacturing or distribution."

31.    The 2015 Exclusive Tristar License provided that Tristar "may grant sublicenses under Bungee Hose License Grant provided . . . any sublicensee shall have no greater right to use, manufacture, have manufactured, offer for sale, sell, distribute, import, export or otherwise dispose of any Licensed Bungee Hose Product," and that such sublicenses complied with certain other restrictions.

32.    The 2015 Exclusive Tristar License provided that "[u]nless terminated earlier in accordance with this Paragraph 9, this Agreement shall expire upon the expiration of the last to expire of the Bungee Hose Patents."

33.    Accordingly, the 2015 Exclusive Tristar License was not set to expire prior to at least 2034.

34.    The 2015 Tristar Exclusive License provided that RTC could terminate the agreement under limited circumstances, namely "in the event [Tristar] fails to pay any amounts due and payable to Licensor hereunder, and fails to make such payment within thirty (30) calendar days after receiving written notice of such failure," and in the event Tristar "commits a material  breach of [the] Agreement, and fails to cure that breach within thirty (30) calendar days after receiving written notice thereof . . . ."

35.    The 2015 Exclusive Tristar License further contained a survival provision providing that in the event the license was terminated, RTC and Tristar must continue to cooperate to the full extent necessary to prosecute and maintain any pending infringement lawsuits.

### 3. The 2017 Amendment

36.    On April 1, 2017, Tristar and Ragner entered into an amendment of the Tristar Exclusive Licenses ("2017 Amendment").

37.    Pursuant to the 2017 Amendment, Ragner conveyed to Tristar a right of first refusal.  Specifically, the 2017 Amendment provided the following: "If Ragner decides to sell itself, its patent royalty income stream, the patents, substantially all of its assets, or any asset that is material to the operation of Ragner's business, then Tristar shall have the right of first refusal to purchase such assets.  The procedure and timing for exercising such right shall be fair and reasonable."

> 6. If Ragner decides to sell itself, its patent royalty income stream, the patents, substantially all of its assets, or any asset that is material to the operation of Ragner's business, then Tristar shall have the right of first refusal to purchase such assets. The procedure and timing for exercising such right shall be fair and reasonable.

38.    Tristar's right of first refusal was a present conveyance at the time the 2017 Amendment was executed and was not limited in duration to the term of the Exclusive Tristar Licenses.

**B.      Litigation Concerning the Ragner Patents**

39.      On October 23, 2012, Blue Gentian, LLC ("Blue Gentian") sued Tristar in the United States District Court for the Southern District of Florida, alleging, *inter alia*, that Tristar's "Flex-Able Hoses" infringe number of patents (the "Blue Gentian Asserted Patents") covering expandable and retractable hose technology, invented by Blue Gentian's principal, Michael Berardi (the "Blue Gentian Action"). The case was subsequently transferred to the District of New Jersey.

40.      National Express, Inc. ("National Express"), which allegedly possessed an exclusive license to the Blue Gentian Asserted Patents, was joined as a co-plaintiff. On September 21, 2017, Telebrands was joined as a co-plaintiff in the Blue Gentian Action, after it acquired National Express's rights in the Blue Gentian Asserted Patents.

41.      On December 20, 2013, Tristar and RTC sued National Express (among others) in the United States District Court for the District of New Jersey, alleging that National Express's "XHose" products infringe the '448 Patent, and subsequently asserted the later-issued '076, and '944 Patents in the same action.

42.      On May 5, 2015, Telebrands initiated a declaratory judgment action in the United States District Court for the District of New Jersey, seeking declarations that its "Pocket Hose" products do not infringe the '448 Patent and that the patent is invalid and unenforceable, and subsequently sought the same with respect to the

'076 Patent in the same action.

43.    Between May 5, 2015, and June 21, 2016, three additional actions were initiated by Tristar and RTC or by Telebrands, alleging that Telebrands infringed certain of the Ragner Patents or seeking a declaratory judgment that Telebrands did not infringe the Ragner Patents, respectively.   The five District of New Jersey Actions involving the Ragner Patents were consolidated for pretrial purposes (the "Consolidated Actions").

44.    On August 26, 2015, Tristar and RTC sued Telebrands, True Value Company, and Scott True Value Hardware in the United States District Court for the District of Delaware, alleging that Telebrands' "Pocket Hose" products infringe the '448 Patent (the "Delaware Action").  Tristar and RTC's claims against Telebrands were severed and transferred to the District of New Jersey, where they became part of the Consolidated Actions.

45.    On August 11, 2022, Tristar sued Perch in the United States District Court for the District of Massachusetts, alleging that Perch's "Flexi Hose" products infringe the Ragner Asserted Patents (the "Perch Action").

46.    Defendant Snow represents Telebrands in the Blue Gentian Action and the Consolidated Actions, and represents True Value Company and Scott True Value Hardware, Inc. in the Delaware Action.  Accordingly, both Telebrands and Snow have been aware of the Tristar Exclusive Licenses since at least May 5, 2015.

47.     For more than a decade, Tristar and RTC cooperated to prosecute and defend the Consolidated Actions and the Delaware Action.  Indeed, as of the date of this Complaint, Tristar and RTC remain aligned in the Consolidated Actions

48.     In the Blue Gentian Action, while the Blue Gentian Asserted Patents initially identified only Michael Berardi as their inventor, Gary Ragner had in fact contributed to the conception of at least one claim in each of the Asserted Patents. During an August 2011 meeting in which RTC was attempting to secure potential investors, Ragner demonstrated his MicroHose prototype and shared other proprietary technical information with Berardi, which Berardi then used to develop his own expandable and retractable hose.  Tristar thus filed a Federal Rule of Civil Procedure 42(b) motion requesting that the court conduct a hearing on the issue of inventorship.  The court ultimately determined that Ragner is a co-inventor of the Blue Gentian Patents, and the Federal Circuit affirmed that determination.

49.     All but one of the Blue Gentian Asserted Patents have thus been corrected to identify Gary Ragner as an inventor.  (A certificate of correction has been approved for U.S. Patent No. 8,479,776, but as of the date of this Complaint, the certificate had not yet issued.)

**C.    Telebrands and Perch's Interference with the Tristar Exclusive Licenses**

50.    Upon information and belief, Telebrands and Perch, individually and collectively, engaged in efforts to interfere with the Tristar Exclusive Licenses, to cause the wrongful (and ineffective) purported termination of those Licenses, and, ultimately, to wrongfully procure from RTC purported assignments of Ragner and RTC's patent rights to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale.

51.    Upon information and belief, at least as early as May 2022, Perch actively negotiated with RTC in an effort to cause the termination of the Tristar Exclusive Licenses and to procure for Perch at least an exclusive license to RTC's patent portfolio.

52.    A draft license agreement between Perch and RTC dated May 24, 2022 ("Perch Draft Agreement") confirms that Perch was aware of the Tristar Exclusive Licenses.  Specifically, the Perch Draft Agreement states that "Ragner has provided to Perch a complete copy of the Tristar License, including any amendments thereto."

53.    The Perch Draft Agreement further confirms that Perch intended that its interference would result in RTC attempting to terminate the Tristar Exclusive Licenses.  Specifically, the Perch Draft Agreement includes a term that states that "Prior to the Effective Date, Ragner has provided Tristar with a complete and correct Tristar Termination Notice."

54.     And the Perch Draft Agreement further confirms that Perch intended to procure its own exclusive license from RTC—a license RTC could not give while the Tristar Exclusive Licenses remained in full force and effect.  Specifically, the Perch Draft Agreement includes a term that states "Prior to the Effective Date, Ragner has provided Tristar with a complete and correct Tristar Termination Notice."

55.     The Perch Draft Agreement defines "Tristar Termination Notice" as "written notice provided to Perch by Ragner that evidences that all exclusive rights of Tristar under any Patents Controlled by Ragner to Exploit Licensed Products have been terminated.  Such evidence may include notice from Tristar that Tristar has granted Ranger permission to grant a non-exclusive license to Perch consistent with the terms of this Agreement."

56.     Upon information and belief, prior to August 11, 2022, Telebrands actively negotiated with RTC in an effort to cause the termination of the Tristar Exclusive License and to procure for Telebrands at least a license to, and ultimately the wrongful purported assignment of, RTC's patent portfolio.

57.     A September 26, 2023 purported assignment of certain patent rights from RTC to Telebrands refers to "an agreement dated October 25, 2022." Notwithstanding repeated requests by counsel for Tristar, Telebrands has refused to produce the purported October 25, 2022 agreement.

58.    Prior to October 25, 2022, Telebrands and RTC entered into one or more non-disclosure agreement(s).  Notwithstanding repeated requests by counsel for Tristar, Telebrands has refused to produce any earlier agreement(s).

59.    At the time Telebrands entered into direct negotiations with RTC, Telebrands knew that Tristar was the exclusive licensee of RTC's patent portfolio and that Tristar possessed the sole right to sublicense others.

60.    At the time Telebrands entered into direct negotiations with RTC, Telebrands knew that RTC had granted Tristar a right of first refusal regarding any sale of RTC's patent portfolio.

61.    Upon information and belief, at the time Telebrands entered into direct negotiations with RTC, Telebrands intended to induce RTC to attempt to terminate the Tristar Exclusive Licenses.

62.    Upon information and belief, at the time Telebrands entered into direct negotiations with RTC, Telebrands intended to induce RTC to breach Tristar's right of first refusal.

63.    Upon information and belief, Telebrands and Perch acted in concert with respect to their efforts to interfere with the Tristar Exclusive Licenses.

64.    As a result of Telebrands and Perch's interference, on August 11, 2022, counsel for RTC sent a letter to counsel for Tristar, stating that RTC intended to terminate the Exclusive License Agreements as of August 12, 2022.

65.    RTC's purported termination of the Tristar Exclusive Licenses was improper, wrongful, and ineffective.  Accordingly, on March 10, 2023, Tristar filed an action against Ragner in the Circuit Court of the Eighth Judicial Circuit of the State of Florida ("Florida Action"), seeking, *inter alia*, an order enjoining Ragner from terminating the Tristar License and reinstating the Tristar License to the extent presently terminated.   The Florida Action remains pending.

**D.    Telebrands' Wrongful Purported Acquisition of the Ragner Patents**

**1. The 2022 Telebrands Agreement**

66.    On October 25, 2022, Telebrands and Ragner and/or RTC entered into an agreement ("2022 Telebrands Agreement").

67.    Upon information and belief, at the time it executed the 2022 Telebrands Agreement, Telebrands knew that RTC's attempted termination of the Exclusive Tristar Licenses was ineffective.

68.    At the time it executed the 2022 Telebrands Agreement, Telebrands knew that RTC had granted Tristar a right of first refusal regarding any sale of RTC's patent portfolio or any portion thereof.

69.    Upon information and belief, Telebrands induced RTC to believe that the 2022 Telebrands Agreement would not inhibit Tristar and RTC's ability to pursue their claims against Telebrands in the Consolidated Cases or against True Value in the Delaware Action, and would not inhibit Tristar and RTC's ability to

recover damages for Telebrands' past infringement in those actions.

70.    Notwithstanding ongoing litigation and mediation efforts between Telebrands and Tristar, Telebrands intentionally withheld from Tristar, the courts, and the mediators involved, both the existence and the contents of the 2022 Telebrands Agreement.

71.    On July 17, 2023, Telebrands represented to the district court in the Blue Gentian Action that "Telebrands has acquired all of the rights necessary to continue this action from the co-inventor Mr. Ragner." Telebrands still did not, however, disclose the existence or contents of the 2022 Telebrands Agreement, and Telebrands provided no support for its assertion.

72.    As of July 17, 2023, Telebrands had not recorded with the Patent Office any purported assignments purporting to transfer any ownership interest(s) from Ragner or RTC to Telebrands.

73.    Upon information and belief, as of July 17, 2023, RTC had not executed any agreement purporting to assign to Telebrands RTC's patent rights.

74.    Meanwhile, as of July 17, 2023, Telebrands knew that Tristar had initiated the Florida Action against RTC and knew that the relief requested by Tristar in that action includes an injunction against termination of the Exclusive Tristar Licenses or actions in contravention thereof.

75.    Tristar promptly, on August 15, 2023 advised the district court that it

was unaware of any purported transfer of rights from Ragner or RTC to Telebrands and requested that Telebrands clarify what rights it purportedly acquired and "produce its license agreement(s) and/or assignment(s) that purportedly give it the rights it claims to have."

76.    Telebrands did not respond to Tristar's August 15, 2023 letter to the district court and did not disclose the existence or contents of the 2022 Telebrands Agreement.

### 2.  The 2023 Purported Assignments

77.    On September 26, 2023, again without Tristar's knowledge or consent, Telebrands purports to have obtained an assignment of a number of patents from RTC, including the Ragner Asserted Patents and the patents asserted in the Blue Gentian Action ("2023 Telebrands Assignment").

78.    Upon information and belief, the 2023 Telebrands Assignment was obtained in knowing contravention of Tristar's rights under the Exclusive Tristar Licenses and of Tristar's right of first refusal.  The 2023 Telebrands Assignment was thus void ab initio.

79.    The 2023 Telebrands Assignment purported to assign to Telebrands "the entire rights, titles, and interest owned by [RTC] in and to [the transferred Ragner patents]."

80.    At the time it procured the 2023 Telebrands Assignment, Telebrands

knew that RTC had granted Tristar a right of first refusal regarding any sale of RTC's patent portfolio or any portion thereof.

81.    At the time it procured the 2023 Telebrands Assignment, Telebrands knew that Tristar had initiated the Florida Action against RTC and knew that the relief requested by Tristar in that action includes an injunction against termination of the Exclusive Tristar Licenses or actions in contravention thereof.

82.    Upon information and belief, at the time it procured the 2023 Telebrands Assignment, Telebrands knew that RTC's attempted termination of the Exclusive Tristar Licenses was ineffective.

83.    Upon information and belief, Telebrands knew at the time it procured the 2023 Telebrands Assignment that RTC was not legally permitted to make such an assignment.

84.    Upon information and belief, Telebrands knew at the time it procured the 2023 Telebrands Assignment that the 2023 Telebrands Assignment was void ab initio.

85.    The 2023 Telebrands Assignment purported to grant Telebrands "the available corresponding rights to sue for past infringement."

86.    Even if the 2023 Telebrands Assignment was valid, it was necessarily encumbered by Tristar's accrued rights to recover for past damages from Telebrands and from Perch.

87.    Upon information and belief, at the time it procured the 2023 Telebrands Assignment, Telebrands knew that, even if the 2023 Telebrands Assignment was valid, it was encumbered by Tristar's accrued rights to recover for past damages from Telebrands and from Perch.

88.    Upon information and belief, Telebrands induced RTC to believe that the 2023 Telebrands Assignment would not inhibit Tristar and RTC's ability to pursue their claims against Telebrands in the Consolidated Actions or against True Value in the Delaware Action, and would not inhibit Tristar and RTC's ability to recover damages for Telebrands' past infringement in those actions.  Indeed, after execution of the 2023 Telebrands Assignment, RTC and Tristar filed an amended complaint in the Delaware Action, and RTC continued to assert the Ragner Asserted Patents in the Consolidated Actions, confirming RTC's belief that the 2022 Telebrands Agreement and the 2023 Telebrands Assignment did not prevent such ongoing assertions.

### E.    Telebrands and Snow's Scheme to Defraud the Patent Office

89.    While Tristar was participating in good faith in court-ordered mediation with Telebrands, Telebrands and Snow were orchestrating and carrying out a scheme (i) to wrongfully establish Telebrands as the owner of record of all right, title in interest in the Ragner Patents; and (ii) to wrongfully cancel all patent claims asserted by Tristar (and Ragner) against Telebrands by purporting to be the rightful owner of

the patents in which those claims appeared.

### 1. Telebrands Wrongfully Records Assignments

90.    On September 27, 2023, without informing Tristar, Telebrands recorded the 2023 Telebrands Assignment.

91.    Telebrands did not advise the Patent Office that the 2023 Telebrands Assignment was void ab initio.

92.    Telebrands did not advise the Patent Office that the 2023 Telebrands Assignment, even if valid, was encumbered by Tristar's accrued rights to recover from Telebrands and Perch for their past infringement.

93.    Telebrands did not advise the Patent Office that Tristar and Ragner were engaged in active litigation (the Florida Action) regarding the Exclusive Tristar Licenses.

### 2. Telebrands and Snow Request Reexamination of Patents

94.    On October 31, 2023, Snow, acting on behalf of and in concert with Telebrands, submitted to the Patent Office requests for ex parte reexamination of the '076 Patent, the '944 Patent, and the '057 Patent.

95.    On November 7, 2023, Snow, acting on behalf of and in concert with Telebrands, submitted to the Patent Office a request for ex parte reexamination of the '448 Patent (collectively with the requests for reexamination of the '076 Patent, the '944 Patent, and the '057 Patent, "the Reexamination Requests").

96.    The Reexamination Requests were transmitted by Snow to the Patent Office via the Patent Office's Electronic Filing System (EFS-Web).

97.    In each of the Reexamination Requests, Snow, acting on behalf of and in concert with Telebrands, stated that the request was made by "patent owner."

98.    Neither Snow nor Telebrands informed Tristar, RTC or the relevant district courts that they requested reexamination of the '076, '944, '057, and '448 Patents.

99.    Neither Tristar nor upon information and belief RTC consented to—or indeed was even aware of—the Reexamination Requests as of the date of their submission or at any time prior to January 31, 2024.

100.    Neither Snow nor Telebrands ever informed the Patent Office that any rights to the relevant patents Telebrands had purportedly acquired were subject to *Tristar's* rights to recover for Telebrands' infringement of those same patents, ***which were already asserted in the pending Consolidated Actions.*** Nor did Snow or Telebrands inform the Patent Office that Tristar possessed a right of first refusal in the event RTC decided to sell the licensed patents, with which RTC had failed to comply. Nor did Snow or Telebrands inform the Patent Office that Tristar and RTC were engaged in litigation regarding the effectiveness of RTC's purported termination of the Tristar Exclusive Licenses.

101.    Moreover, in the Reexamination Requests, Snow and Telebrands were

required to identify whether each patent was "currently the subject of . . . concurrent proceedings." While Snow and Telebrands identified the Consolidated Actions and the Perch Action, they failed to disclose to the Patent Office the full scope of those ongoing litigations, including that the very patents Telebrands sought reexamination of as *purported patent owner* were actively asserted *against it* in co-pending litigation.

### 3. Telebrands and Snow Wrongfully Cancel Patent Claims

102. Telebrands and Snow's Reexamination Requests proved to be a convoluted charade. Using the guise of seemingly legitimate reexamination proceedings, Telebrands and Snow wrongfully canceled the patent claims asserted against Telebrands and Perch by Tristar and RTC.

103. In each Reexamination, on November 14, 2023, Snow, acting on behalf of and in concert with Telebrands, submitted a "Statement Under 37 C.F.R. 3.73(c)," certifying that it is "[t]he assignee of the entire right, title, and interest" in each of the subject patents.

104. Snow, acting on behalf of and in concert with Telebrands, submitted the "Statement[s] Under 37 C.F.R. 3.73(c)" through EFS-Web.

105. Upon information and belief, Snow and Telebrands knew that Telebrands was not, in fact, "[t]he assignee of the entire right, title and interest" of any of the subject patents, because the 2023 Telebrands Assignment was void ab

initio and, even if valid, was encumbered by Tristar's license rights and accrued rights to recover for past infringement.

106.    Upon information and belief, Snow and Telebrands intentionally withheld from the Patent Office that the 2023 Telebrands Assignment was void ab initio at least because Tristar possessed a right of first refusal in the event RTC decided to sell the licensed patents, or that Telebrands' rights to the patents (if any) were subject to Tristar's rights to recover for Telebrand's infringement of those same patents already asserted in the pending Consolidated Actions.

107.    Then, on January 29, 2024, in each of the Reexaminations, Snow, acting on behalf of and in concert with Telebrands, submitted a "Patent Owner's Statement" ***requesting entry of an "amendment" canceling all claims of each of the Ragner Asserted Patents.***




108.    Neither Snow nor Telebrands informed the Patent Office that the 2023 Telebrands Assignment, on the basis of which Telebrands purported to be the "Patent Owner" when requesting the cancelation of the claims of the Ragner Asserted Patents, was void ab initio.  Neither Snow nor Telebrands informed the Patent Office that, even if the 2023 Telebrands Assignment was valid, it was encumbered by Tristar's right to recover for past damages, such that Telebrands could not hold all right, title and interest necessary to voluntarily cancel the patents' claims.

109.    Nor did Telebrands or Snow inform Tristar, RTC or the relevant district courts that it intended to submit or had submitted purported Patent Owner's Statements under 37 C.F.R. § 1.530(b) seeking to voluntarily cancel all claims of the patents asserted in the Consolidated Actions.

110.    Tristar only became aware of the Reexaminations and Telebrands' statement as purported patent owner *from counsel for Perch*, who, on January 31, 2024 (two days later), informed counsel for Tristar that Telebrands had requested that the Patent Office cancel all claims of the Ragner Asserted Patents.  Upon information and belief, Perch was aware of the Reexaminations and activities taken in those proceedings because it has been acting in concert with Telebrands to wrongfully extinguish Tristar's rights.  This relationship was confirmed by Snow's in-person attendance at a February 7, 2024 motions hearing in the Perch Action and

by Snow's meetings with counsel for Perch both before and after that hearing.

111.   And further confirming that Telebrands and Snow knew that their efforts to cancel the patents' claims was wrongful, when Tristar filed papers with the Patent Office in an effort to alert the Office to the Tristar Exclusive Licenses and the ongoing litigations involving Telebrands, Perch, Tristar, and RTC, Telebrands urged the Patent Office to expunge them.  Not because the information Tristar presented was faulty, but upon information and belief, because Telebrands did not want the information to come to light, lest the Patent Office come to appreciate the wrongfulness of Telebrands and Snow's scheme.

112.   Upon information and belief, during Telebrands and RTC's negotiations, Telebrands did not disclose to or otherwise inform RTC of its scheme to cancel all remaining claims of the patents, or otherwise extinguish any of the patent rights it purportedly acquired.

113.   Between April 17, 2024 and April 19, 2024, the Patent Office issued reexamination certificates canceling all claims of the Ragner Asserted Patents as requested by Telebrands.

114.   Lest there be any confusion, the Patent Office did not determine in the Reexaminations that any claim of the Ragner Asserted Patents was invalid.  Instead, the Patent Office simply canceled the claims because Telebrands and Snow claimed that Telebrands was the patent owner and was thus entitled to voluntarily cancel its

own claims—patent claims that, in reality, were being asserted against Telebrands by Tristar and RTC.

**F.    Telebrands Attempts to Create a Wrongful Monopoly**

115.    Telebrands and Snow's wrongful cancelation of the patent claims asserted in the Consolidated Actions, the Perch Action, and the Delaware Action was not the end of their scheme.  As summarized above, for over a decade, Telebrands and Tristar have engaged in litigation regarding patent rights over expandable and retractable hoses.  Tristar sought to maintain its rightful monopoly as the exclusive licensee of RTC's patent portfolio.  Telebrands, by contrast, sought to enforce a set of patents that were wrongfully obtained and on which Ragner was wrongfully omitted as an inventor.

116.    Telebrands and Snow's wrongful cancelation of the patent claims asserted in the Consolidated Actions, the Perch Action and the Delaware Action effectively extinguished Tristar's rightful monopoly in the market for expandable and retractable hoses and its outstanding patent infringement claims worth tens, if not hundreds, of millions of dollars.

117.    Through its wrongful procurement of the 2023 Telebrands Assignment, however, Telebrands also is now wrongfully prosecuting patent infringement claims in the Blue Gentian Action based on its fraudulently obtained purported assignments.

118.    Telebrands repeatedly represented to the district court overseeing the

Blue Gentian Action that the court's inventorship ruling in Ragner and Tristar's favor "essentially amounts to a final judgment." But as alleged above, immediately upon the Federal Circuit's affirmance of the district court's ruling, Telebrands claimed that "the Court's co-inventorship decision will not terminate this matter. Telebrands has acquired all of the rights necessary to continue this action from the co-inventor Mr. Ragner."

119.    And at a February 14, 2024 hearing in the Blue Gentian Action, counsel for Telebrands asserted that Telebrands intends to pursue its patent infringement claims against Tristar "in view of those rights it acquired from Ragner"—rights Telebrands could not have rightfully acquired.

120.    Defendants' wrongful acts have caused significant harm to Tristar and to the market for expandable and retractable hoses. Further wrongful acts must be enjoined. And the harms caused must be remedied.

## COUNT I

### Tortious Interference With Contractual Relationship, Under Florida Common Law
**(Against Telebrands)**

121.    Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

122.    Tristar entered into the 2012 Exclusive Tristar License on October 19, 2012, and the 2015 Exclusive Tristar License on November 9, 2015. At least through

August 11, 2022, The Tristar Exclusive Licenses remained valid and enforceable contracts.   Tristar alleges that the Tristar Exclusive Licenses remain valid and enforceable contracts.

123.   Telebrands was aware of the Tristar Exclusive Licenses no later than May 5, 2015.

124.   Perch was aware of the Tristar Exclusive License no later than May 24, 2022.

125.   Upon information and belief, Telebrands and Perch, individually and collectively, intentionally interfered with the Tristar Exclusive Licenses by causing RTC to wrongfully terminate them.

126.   Perch was aware that RTC would need to terminate the Exclusive License Agreements with Tristar in order to enter into a license agreement with Perch, which Perch was negotiating as early as May 2022.

127.   Telebrands was aware that RTC would need to terminate the Exclusive License Agreements with Tristar in order to assign its rights to the licensed patents to Telebrands.

128.   Upon information and belief, Telebrands and Perch interfered with the Tristar Exclusive Licenses for the purpose of Telebrands wrongfully procuring purported assignments of Ragner and RTC's patent rights to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on

their sale, and Perch obtaining a license to the same.

129.   As a result of Telebrands and Perch's interference, on August 11, 2022, RTC advised Tristar that it intended to terminate the Exclusive License Agreements as of August 12, 2022.

130.   As a direct and proximate results of Telebrands' conduct, Tristar has suffered substantial damages.  Tristar invested in marketing and production of inventory of hoses covered by the patents licensed under the Tristar Exclusive Licenses.  Tristar also had an expectation of profits from future sales of hoses covered by the patents licensed under the Tristar Exclusive Licenses, and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.  Moreover, Tristar has suffered damages as a result of Telebrands' ultimate (wrongful) acquisition of Ragner and RTC's patent rights, to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale.

## COUNT II

### Tortious Interference with Contractual Relationship, Under New Jersey Common Law
**(Against Telebrands)**

131.   Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

132. Tristar entered into the 2012 Exclusive Tristar License on October 19, 2012, and the 2015 Exclusive Tristar License on November 9, 2015. At least through August 11, 2022, The Tristar Exclusive Licenses remained valid and enforceable contracts, at least through August 11, 2022. Tristar alleges that the Tristar Exclusive Licenses remain valid and enforceable contracts.

133. Telebrands was aware of the Tristar Exclusive Licenses no later than May 5, 2015.

134. Perch was aware of the Tristar Exclusive License no later than May 24, 2022.

135. Upon information and belief, Telebrands and Perch, individually and collectively, intentionally interfered with the Tristar Exclusive Licenses by causing RTC to wrongfully terminate them.

136. Perch was aware that RTC would need to terminate the Exclusive License Agreements with Tristar in order to enter into a license agreement with Perch, which Perch was negotiating as early as May 2022.

137. Telebrands was aware that RTC would need to terminate the Exclusive License Agreements with Tristar in order to assign its rights to the licensed patents to Telebrands.

138. Upon information and belief, Telebrands and Perch interfered with the Tristar Exclusive Licenses for the purpose of Telebrands wrongfully procuring

purported assignments of Ragner and RTC's patent rights to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale, and Perch obtaining a license to the same.

139.   As a result of Telebrands and Perch's interference, on August 11, 2022, RTC advised Tristar that it intended to terminate the Exclusive License Agreements as of August 12, 2022.

140.   As a direct and proximate results of Telebrands' conduct, Tristar has suffered substantial damages.   Tristar invested in marketing and production of inventory of hoses covered by the patents licensed under the Tristar Exclusive Licenses.   Tristar also had an expectation of profits from future sales of hoses covered by the patents licensed under the Tristar Exclusive Licenses, and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.   Moreover, Tristar has suffered damages as a result of Telebrands' ultimate (wrongful) acquisition of Ragner and RTC's patent rights, to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale.

## COUNT III

### Conspiracy, Under Florida Common Law
### (Against Telebrands and Perch)

141.   Tristar repeats and realleges each of the foregoing paragraphs by

reference as if fully set forth herein.

142.    Upon information and belief, Telebrands and Perch agreed to intentionally and wrongfully interfere with the Tristar Exclusive Licenses by causing RTC to wrongfully terminate them.

143.    Telebrands and Perch were aware of the Tristar Exclusive Licenses, and aware that the Tristar Exclusive Licenses stood in the way of Perch obtaining a license to RTC's patent and of Telebrands acquiring rights to RTC's patents.

144.    Accordingly, upon information and belief, Telebrands and Perch wrongfully interfered with the Tristar Exclusive Licenses to cause RTC to terminate them.

145.    As a result of Telebrands and Perch's interference, on August 11, 2022, RTC advised Tristar that it intended to terminate the Exclusive License Agreements as of August 12, 2022.

146.    As a direct and proximate results of Telebrands' conduct, Tristar has suffered substantial damages.  Tristar invested in marketing and production of inventory of hoses covered by the patents licensed under the Tristar Exclusive Licenses.  Tristar also had an expectation of profits from future sales of hoses covered by the patents licensed under the Tristar Exclusive Licenses, and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the

Delaware Action.  Moreover, Tristar has suffered damages as a result of Telebrands' ultimate (wrongful) acquisition of Ragner and RTC's patent rights, to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale.

## COUNT IV

### Conspiracy, Under New Jersey Common Law
### (Against Telebrands and Perch)

147.  Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

148.  Upon information and belief, Telebrands and Perch agreed to intentionally and wrongfully interfere with the Tristar Exclusive Licenses by causing RTC to wrongfully terminate them.

149.  Telebrands and Perch were aware of the Tristar Exclusive Licenses, and aware that the Tristar Exclusive Licenses stood in the way of Perch obtaining a license to RTC's patent and of Telebrands acquiring rights to RTC's patents.

150.  Accordingly, upon information and belief, Telebrands and Perch wrongfully interfered with the Tristar Exclusive Licenses to cause RTC to terminate them.

151.  As a result of Telebrands and Perch's interference, on August 11, 2022, RTC advised Tristar that it intended to terminate the Exclusive License Agreements as of August 12, 2022.

152.   As a direct and proximate results of Telebrands' conduct, Tristar has suffered substantial damages.  Tristar invested in marketing and production of inventory of hoses covered by the patents licensed under the Tristar Exclusive Licenses.  Tristar also had an expectation of profits from future sales of hoses covered by the patents licensed under the Tristar Exclusive Licenses, and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.  Moreover, Tristar has suffered damages as a result of Telebrands' ultimate (wrongful) acquisition of Ragner and RTC's patent rights, to which Tristar has at all relevant times been an exclusive licensee and the holder of a right of first refusal on their sale.

## COUNT V

## Fraud, Under Florida Common Law
### (Against Telebrands and Snow)

153.   Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

154.   Upon information and belief, at least in October 2022 and September 2023, Telebrands knowingly falsely represented to RTC that RTC's execution of the 2022 Telebrands Agreement and the 2023 Telebrands Assignment, respectively, would not interfere with Tristar and RTC's ability to pursue the Consolidated Actions or the Delaware Action or to recover past patent infringement damages from

Telebrands in those actions.

155.   Telebrands' false representations were material.

156.   On the basis of Telebrands' false representations, RTC executed the 2022 Telebrands Agreement and the 2023 Telebrands Assignment.

157.   The mission of the United States Patent and Trademark Office is to drive U.S. innovation, inclusive capitalism, and global competitiveness,[1] not to provide wrongdoers a platform to carry out their schemes.

158.   On November 14, 2023, Telebrands and Snow falsely stated to the United States Patent and Trademark Office in the Reexamination Requests that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents.

159.   In the Reexaminations, Telebrands and Snow continued to falsely represent to the Office that Telebrands is the owner of the '448, '076, '944, and '057 Patents, including with respect to its "Patent Owner's Statements" requesting the cancellation of all claims.

160.   Telebrands and Snow were aware that the statements regarding Telebrands' ownership of the '448, '076, '944, and '057 Patents were false, at least because Telebrands was aware that Tristar possessed a right of first refusal to purchase the patents and because Telebrands never acquired the rights to recover for

---

[1]    https://www.commerce.gov/bureaus-and-offices/uspto.

infringement of the patents at issue in the already-pending litigation.

161.   Telebrands and Snow's false statements were material.

162.   On the basis of Telebrands and Snow's false statements, on January 29, 2024, in each of the Reexaminations, Telebrands submitted "Patent Owner Statements" requesting the cancellation of all claims of each of the '448, '076, '944, and '057 Patents.

163.   Telebrands and Snow falsely stated that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents to induce the Office to cancel all claims of the Patents at Telebrands' and Snow's request.

164.   Telebrands and Snow owed a duty of candor and good faith to the Office in the Reexaminations at least pursuant to 37 C.F.R. § 1.555 and 37 C.F.R. § 11.303(d).

165.   The United States Patent and Trademark Office relied on Telebrands and Snow's false representations in cancelling all claims of the '448, '076, '944, and '057 Patents, as Telebrands and Snow requested.

166.   As a direct and proximate results of Telebrands and Snow's conduct, Tristar has suffered substantial damages.  Tristar has been injured by the cancellation of the '448, '076, '944, and '057 Patents, because Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale.

Tristar's damages include at least the economic harm it has experienced from its loss of market exclusivity, as well as the past and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.

## COUNT VI

### Fraud, Under New Jersey Common Law
**(Against Telebrands and Snow)**

167.    Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

168.    Upon information and belief, at least in October 2022 and September 2023, Telebrands knowingly falsely represented to RTC that RTC's execution of the 2022 Telebrands Agreement and the 2023 Telebrands Assignment, respectively, would not interfere with Tristar and RTC's ability to pursue the Consolidated Actions or the Delaware Action or to recover past patent infringement damages from Telebrands in those actions.

169.    Telebrands' false representations were material.

170.    On the basis of Telebrands' false representations, RTC executed the 2022 Telebrands Agreement and the 2023 Telebrands Assignment.

171.    The mission of the United States Patent and Trademark Office is to

drive U.S. innovation, inclusive capitalism, and global competitiveness,[2] not to provide wrongdoers a platform to carry out their schemes.

172.  On November 14, 2023, Telebrands and Snow falsely stated to the United States Patent and Trademark Office in the Reexamination Requests that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents.

173.  In the Reexaminations, Telebrands and Snow continued to falsely represent to the Office that Telebrands is the owner of the '448, '076, '944, and '057 Patents, including with respect to its "Patent Owner's Statements" requesting the cancellation of all claims.

174.  Telebrands and Snow were aware that the statements regarding Telebrands' ownership of the '448, '076, '944, and '057 Patents were false, at least because Telebrands was aware that Tristar possessed a right of first refusal to purchase the patents and because Telebrands never acquired the rights to recover for infringement of the patents at issue in the already-pending litigation.

175.  Telebrands and Snow's false statements were material.

176.  On the basis of Telebrands and Snow's false statements, on January 29, 2024, in each of the Reexaminations, Telebrands submitted "Patent Owner Statements" requesting the cancellation of all claims of each of the '448, '076, '944,

---

[2]    https://www.commerce.gov/bureaus-and-offices/uspto.

and '057 Patents.

177.    Telebrands and Snow falsely stated that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents to induce the Office to cancel all claims of the Patents at Telebrands' and Snow's request.

178.    Telebrands and Snow owed a duty of candor and good faith to the Office in the Reexaminations at least pursuant to 37 C.F.R. § 1.555 and 37 C.F.R. § 11.303(d).

179.    The United States Patent and Trademark Office relied on Telebrands and Snow's false representations in cancelling all claims of the '448, '076, '944, and '057 Patents, as Telebrands and Snow requested.

180.    As a direct and proximate results of Telebrands and Snow's conduct, Tristar has suffered substantial damages.  Tristar has been injured by the cancellation of the '448, '076, '944, and '057 Patents, because Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale. Tristar's damages include at least the economic harm it has experienced from its loss of market exclusivity, as well as the past and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.

## **COUNT VII**

### **Violation of 18 U.S.C. § 1962(c) (Civil RICO)**
**(Against Telebrands and Snow)**

181. Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

182. Together, Telebrands and Snow constitute an enterprise within the meaning of 18 U.S.C. § 1962(c). At all relevant times, Snow was, and upon information and belief Snow remains, outside counsel to Telebrands.

183. Upon information and belief, Snow actively participated in directing the Telebrands-Snow enterprise by orchestrating a scheme to falsely represent to the Office that Telebrands is the owner of all rights to the '448, '076, '944, and '057 Patents, and causing their cancellation.

184. Snow, acting on behalf of and in concert with Telebrands, made false statements to the Office on at least eight occasions in violation of 18 U.S.C. § 1343.

    a. In connection with the Reexamination of the '448 Patent, in the Reexamination Request, Telebrands through its attorney Snow falsely represented that Telebrands was the "patent owner." In the "Statement Under 37 C.F.R. 3.73(c)," Telebrands and Snow again falsely represented that Telebrands was "[t]he assignee of the entire right, title, and interest" in the '448 Patent. Telebrands and Snow continued to falsely represent that Telebrands owned the '448 Patent during the

Reexamination, including with respect to its "Patent Owner's Statement" requesting the cancellation of all claims.

b.  In connection with the Reexamination of the '076 Patent, in the Reexamination Request, Telebrands through its attorney Snow falsely represented that Telebrands was the "patent owner."  In the "Statement Under 37 C.F.R. 3.73(c)," Telebrands and Snow again falsely represented that Telebrands was "[t]he assignee of the entire right, title, and interest" in the '076 Patent.  Telebrands and Snow continued to falsely represent that Telebrands owned the '076 Patent during the Reexamination, including with respect to its "Patent Owner's Statement" requesting the cancellation of all claims.

c.  In connection with the Reexamination of the '944 Patent, in the Reexamination Request, Telebrands through its attorney Snow falsely represented that Telebrands was the "patent owner."  In the "Statement Under 37 C.F.R. 3.73(c)," Telebrands and Snow again falsely represented that Telebrands was "[t]he assignee of the entire right, title, and interest" in the '944 Patent.  Telebrands and Snow continued to falsely represent that Telebrands owned the '944 Patent during the Reexamination, including with respect to its "Patent Owner's Statement" requesting the cancellation of all claims.

d. In connection with the Reexamination of the '057 Patent, in the Reexamination Request, Telebrands through its attorney Snow falsely represented that Telebrands was the "patent owner." In the "Statement Under 37 C.F.R. 3.73(c)," Telebrands and Snow again falsely represented that Telebrands was "[t]he assignee of the entire right, title, and interest" in the '057 Patent. Telebrands and Snow continued to falsely represent that Telebrands owned the '057 Patent during the Reexamination, including with respect to its "Patent Owner's Statement" requesting the cancellation of all claims.

e. Upon information and belief, each of Telebrands and Snow's statements to the Office were transmitted via the Office's Electronic Filing System (EFS-Web).

f. Telebrands and Snow were aware that their statements regarding Telebrands' ownership of the '448, '076, '944, and '057 Patents were false, at least because Telebrands was aware that Tristar possessed a right of first refusal to purchase the patents and because Telebrands never acquired the rights to recover for infringement of the patents at issue in the already-pending litigation.

g. Telebrands and Snow's false statements were material.

h. On the basis of Telebrands and Snow's false statements, on January 29,

2024, in each of the Reexaminations, Telebrands submitted "Patent Owner Statements" requesting the cancellation of all claims of each of the '448, '076, '944, and '057 Patents.

    i.   Telebrands and Snow falsely stated that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents to induce the Office to cancel all claims of the Patents at Telebrands' and Snow's request, in furtherance of Telebrands and Snow's scheme to extinguish Tristar's patent rights.

    j.   The Patent Office relied on Telebrands and Snow's false representations in cancelling all claims of the '448, '076, '944, and '057 Patents, as Telebrands and Snow requested.

185.   As a direct and proximate results of Telebrands and Snow's conduct, Tristar has suffered substantial damages.  Tristar has been injured by the cancellation of the '448, '076, '944, and '057 Patents, because Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale. Tristar's damages include the future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.

## COUNT VIII

## Conspiracy, Under Florida Common Law
**(Against Telebrands and Snow)**

186.   Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

187.   Upon information and belief, Snow and Telebrands agreed to carry out a scheme to falsely represent to the Office that Telebrands is the owner of all rights to the '448, '076, '944, and '057 Patents, for the purpose of wrongfully procuring their cancellation.

188.   Upon information and belief, as part of that scheme, at least in October 2022 and September 2023, Telebrands knowingly falsely represented to RTC that RTC's execution of the 2022 Telebrands Agreement and the 2023 Telebrands Assignment, respectively, would not interfere with Tristar and RTC's ability to pursue the Consolidated Actions or the Delaware Action or to recover past patent infringement damages from Telebrands in those actions.

189.   Telebrands' false representations were material.

190.   On the basis of Telebrands' false representations, RTC executed the 2022 Telebrands Agreement and the 2023 Telebrands Assignment.

191.   In furtherance of Snow and Telebrands' agreement to wrongfully procure the cancellation of the '448, '076, '944, and '057 Patents, on November 14, 2023, Telebrands and Snow falsely stated to the United States Patent and Trademark

Office in the Reexamination Requests that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents.

192.   In the Reexaminations, Telebrands and Snow continued to falsely represent to the Office that Telebrands is the owner of the '448, '076, '944, and '057 Patents, including with respect to its "Patent Owner's Statements" requesting the cancellation of all claims.

193.   Telebrands and Snow were aware that the statements regarding Telebrands' ownership of the '448, '076, '944, and '057 Patents were false, at least because Telebrands was aware that Tristar possessed a right of first refusal to purchase the patents and because Telebrands never acquired the rights to recover for infringement of the patents at issue in the already-pending litigation.

194.   Telebrands and Snow's false statements were material.

195.   On the basis of Telebrands and Snow's false statements, on January 29, 2024, in each of the Reexaminations, Telebrands submitted "Patent Owner Statements" requesting the cancellation of all claims of each of the '448, '076, '944, and '057 Patents.

196.   Telebrands and Snow falsely stated that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents to induce the Office to cancel all claims of the Patents at Telebrands' and Snow's request.

48

197.   Telebrands and Snow owed a duty of candor and good faith to the Office in the Reexaminations at least pursuant to 37 C.F.R. § 1.555 and 37 C.F.R. § 11.303(d).

198.   The United States Patent and Trademark Office relied on Telebrands and Snow's false representations in cancelling all claims of the '448, '076, '944, and '057 Patents, as Telebrands and Snow requested.

199.   As a direct and proximate results of Telebrands and Snow's conduct, Tristar has suffered substantial damages.  Tristar has been injured by the cancellation of the '448, '076, '944, and '057 Patents, because Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale. Tristar's damages include at least the economic harm it has experienced from its loss of market exclusivity, as well as the past and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.

## COUNT IX

### Conspiracy, Under New Jersey Common Law
**(Against Telebrands and Snow)**

200.   Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

201.   Upon information and belief, Snow and Telebrands agreed to carry out a scheme to falsely represent to the Office that Telebrands is the owner of all rights

to the '448, '076, '944, and '057 Patents, for the purpose of wrongfully procuring their cancellation.

202.   Upon information and belief, as part of that scheme, at least in October 2022 and September 2023, Telebrands knowingly falsely represented to RTC that RTC's execution of the 2022 Telebrands Agreement and the 2023 Telebrands Assignment, respectively, would not interfere with Tristar and RTC's ability to pursue the Consolidated Actions or the Delaware Action or to recover past patent infringement damages from Telebrands in those actions.

203.   Telebrands' false representations were material.

204.   On the basis of Telebrands' false representations, RTC executed the 2022 Telebrands Agreement and the 2023 Telebrands Assignment.

205.   In furtherance of Snow and Telebrands' agreement to wrongfully procure the cancellation of the '448, '076, '944, and '057 Patents, on November 14, 2023, Telebrands and Snow falsely stated to the United States Patent and Trademark Office in the Reexamination Requests that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents.

206.   In the Reexaminations, Telebrands and Snow continued to falsely represent to the Office that Telebrands is the owner of the '448, '076, '944, and '057 Patents, including with respect to its "Patent Owner's Statements" requesting the cancellation of all claims.

207.    Telebrands and Snow were aware that the statements regarding Telebrands' ownership of the '448, '076, '944, and '057 Patents were false, at least because Telebrands was aware that Tristar possessed a right of first refusal to purchase the patents and because Telebrands never acquired the rights to recover for infringement of the patents at issue in the already-pending litigation.

208.    Telebrands and Snow's false statements were material.

209.    On the basis of Telebrands and Snow's false statements, on January 29, 2024, in each of the Reexaminations, Telebrands submitted "Patent Owner Statements" requesting the cancellation of all claims of each of the '448, '076, '944, and '057 Patents.

210.    Telebrands and Snow falsely stated that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the '448, '076, '944, and '057 Patents to induce the Office to cancel all claims of the Patents at Telebrands' and Snow's request.

211.    Telebrands and Snow owed a duty of candor and good faith to the Office in the Reexaminations at least pursuant to 37 C.F.R. § 1.555 and 37 C.F.R. § 11.303(d).

212.    The United States Patent and Trademark Office relied on Telebrands and Snow's false representations in cancelling all claims of the '448, '076, '944, and '057 Patents, as Telebrands and Snow requested.

213.  As a direct and proximate results of Telebrands and Snow's conduct, Tristar has suffered substantial damages.  Tristar has been injured by the cancellation of the '448, '076, '944, and '057 Patents, because Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale. Tristar's damages include at least the economic harm it has experienced from its loss of market exclusivity, as well as the past and future royalties and/or damages from enforcement of such patents against third-party infringers, including in the Consolidated Actions, the Perch Action, and the Delaware Action.

## COUNT X

## Attempted Monopoly in Violation of 15 U.S.C. § 2
(Against Telebrands and Snow)

214.  Tristar repeats and realleges each of the foregoing paragraphs by reference as if fully set forth herein.

215.  Telebrands knowingly and purposefully engaged in anticompetitive conduct in an attempt to establish its monopoly power over the market for expandable hoses in violation of 15 U.S.C. § 2.

216.   Expandable garden hoses generally differ from ordinary hoses in terms of their (1) physical characteristics including weight and size; (2) advertising and sales channels; and (3) consumer perception.

217.  First, in terms of physical product characteristics, expandable hoses have only a fraction of the weight and size of most ordinary garden hoses, making

them more convenient to use and store.  For example, upon information and belief, for a 50 feet long hose, expandable garden hoses generally weigh less than two pounds whereas ordinary garden hoses typically weigh more than six pounds.  Upon information and belief, the "heavy-duty" versions of non-retractable hoses can even weigh on the order of 12 pounds—six times the weight of a typical expandable hose of the same length.  Similarly, in addition to weight, upon information and belief, there is typically a noticeable difference in size.

218.   Upon information and belief, in view of this noticeable difference in terms of size and weight, consumers desiring to purchase an expandable hose would not consider regular (non-expandable) garden hoses with substantially higher weight and size to fall within the same product category.  And as a result, upon information and belief, demand for ordinary garden hoses of typical weight will not vary with the change of prices in expandable hoses so as to establish a low cross-elasticity of demand between these two product categories.

219.  Second, expandable hoses differ from ordinary hoses because expandable hoses are promoted differently.  Whereas ordinary hoses are primarily sold in brick-and-mortar stores and considered undifferentiated commodity products, expandable hoses are heavily promoted for their specific features—both online and through direct-response TV advertising.  Such advertising illustrates that the specific characteristics and uses of expandable hoses have appeal to a distinct

customer base, which, upon information and belief, leads to a distinct pricing structure and consumer demand that is not sensitive to price changes of expandable hose products.

220.  Third, there is direct evidence that consumers perceive expandable hoses as a separate product category.  Various industry reports characterize "flexible garden hoses" or "expandable hoses" as a category separate and apart from ordinary hoses.  Such reports recognize that the former are relatively new to the market and work differently from traditional hoses, and therefore may experience increased consumer demand as compared to traditional hoses.

221.  Telebrands intends to monopolize the market for expandable hoses. Telebrands' conduct evinces specific intent to monopolize by knowingly and willfully fraudulently obtaining patent rights from RTC and Ragner, and then continuing to pursue the enforcement of fraudulently obtained patents against Tristar; and cancelling the patent rights asserted against it by Tristar.

222.  Telebrands wrongfully obtained Ragner and RTC's patents relating to expandable hose technology, with the knowledge that Tristar has at all relevant times been their exclusive licensee and the holder of a right of first refusal on their sale.

223.  Telebrands is continuing to enforce the patents it fraudulently obtained against Tristar in the Blue Gentian Action, despite previously agreeing that its claims have already been resolved.

224.   Telebrands fraudulently caused the cancellation of the patents asserted against it by falsely stating to the Office that it was "[t]he assignee of the entire right title, and interest" in those patents, and requesting their cancellation.

225.   Upon information and belief, Telebrands concealed from Ragner and RTC its plan to wrongfully cancel certain of the patents it acquired from Ragner and RTC.

226.   As a direct and proximate result of Telebrands' unlawful conduct, there is a "dangerous probability" that Telebrands will achieve monopoly power, given the reduced competition, quality, innovation, and consumer choice that will result from Telebrands' conduct, licensing activities, and market share.

227.   Due its unlawful practices, Telebrands now purports to own more than X patents covering expandable and retractable hose technologies.  Upon information and belief, Telebrands' market share alone exceeds 70% of the market and by itself easily supports the finding of such a dangerous probability.

228.   Telebrands' wrongful conduct has resulted in substantial profit losses to Tristar and substantial unjust enrichment to Telebrands.

229.   Telebrands' conduct is willful with full knowledge and with the purpose of pushing Tristar and other competitors out of the expandable hose market, in conscious disregard of the rights of Tristar and consumers.

230.   As a direct and proximate result of Telebrands' wrongful conduct,

Tristar has suffered and continues to suffer irreparable injury.  Unless enjoined by the Court, Telebrands will continue to engage in these unlawful acts, which irreparably injure Tristar and the public.

## **PRAYER FOR RELIEF**

WHEREFORE, Tristar respectfully requests the following relief:

A.    That the Court enter judgment in Tristar's favor on all claims;

B.    That the Court restrain and enjoin Telebrands, its agents, representatives, employees, attorneys, successors, assigns, and all others in active concert or participation with them from engaging in conduct meant to unlawfully exclude competitors from the expandable hose market;

C.    That the Court order Defendants to pay Tristar damages in an amount to be determined at trial;

D.    That the Court assess pre-judgment and post-judgment interest and costs against Defendants;

E.    That the Court order Defendants to pay treble damages or statutory damages, including pursuant to 18 U.S.C. § 1964 and 15 U.S.C. § 15;

F.    That the Court order Defendants to pay punitive damages;

G.    That the Court order Defendants to pay Tristar's costs and reasonable attorney's fees; and

H.    That the Court order such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Tristar Products demands a trial by jury of all issues properly triable to a jury in this case.

DATED:  May 22, 2024

By:  */s/ MICHAEL J. RIGELSKY*

MICHAEL J. RIGELSKY, ESQUIRE
Florida Bar No. 126168
GREGORY E. JORDAN, ESQUIRE
Florida Bar No. 112979
KARA N. HILT, ESQUIRE
Florida Bar No. 1022366
GOLDBERG SEGALLA, LLP
800 N. Magnolia Avenue | Suite 450
Orlando, FL 32801
Telephone: (407) 458-5600
E-Service Email:
ORLpleadings@goldbergsegalla.com
Secondary Emails:
mrigelsky@goldbergsegalla.com
dmatthews@goldbersegalla.com
ecanto@goldbergsegalla.com


Nicole M. Jantzi (*Pro Hac Vice to be filed*)
(nicole.jantzi@friedfrank.com)
Paul M. Schoenhard (*Pro Hac Vice to be filed*)
(paul.schoenhard@friedfrank.com)
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
801 17th Street NW

Washington, DC 20006
Telephone: (202) 639-7265

Emma K. Kolesar (*Pro Hac Vice to be filed*)
(emma.kolesar@friedfrank.com)
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000

*Attorneys for Plaintiff*
*Tristar Products, Inc.*